## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **TINA A. ENDICOTT and DENISE T. MEDINA, individually and on behalf of themselves and all others similarly situated,** | **Case No.** |
| **Plaintiffs,** | |
| **vs.** | **COMPLAINT** |
| **GEORGE MARCUS and MARCUS, CLEGG, BALS & ROSENTHAL, P.A. (f/k/a MARCUS, CLEGG & MISTRETTA, P.A.),** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

Tina A. Endicott and Denise T. Medina, individually bring this non-opt out class action individually and on behalf of all similarly situated purchasers/investors of securities pursuant to the scheme described herein which appeared to provide investors with an opportunity to indirectly invest in the growth of MDO, LLC, but was in reality part of a scheme to line the pockets of the scheme's perpetrators, and generate legal fees for Defendants George Marcus ("Marcus"), his law firm Marcus, Clegg, Bals & Rosenthal, P.A. (formerly known as Marcus Clegg & Mistretta, P.A.) ("Marcus Clegg" and, together with Marcus, the "Defendants")[1].

---

[1] Plaintiffs, by and through their attorneys, allege the following upon information and belief, except as to those allegations sounding in fraud and except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, their counsels' investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Mozido and certain entities controlled by Liberty including Brentwood Financial and Mozido Invesco with the United States Securities and Exchange Commission ("SEC"); (b) review of the documents filed in the proceedings brought by the SEC starting on or about March 30, 2018, against certain individuals and companies, including George Marcus and Michael Liberty, in connection with the MDO alleged fraud, in the case of *SEC v. Liberty, et al.*, No. 2:18-cv-00139-DBH (D. Maine, filed Mar. 30, 2018) (the "SEC Action"); (c) review of the documents filed in the proceedings brought by the SEC starting on or about March 8, 2006, against certain individuals and companies, including Michael Liberty, in the case of *SEC v. Liberty, et al.*, No. 2:06-cv-01030-JD (E.D. Pa, filed Mar. 8, 2006) (the "SEC Keystone Action") (d) a review of other publicly available information

# I.    INTRODUCTION

1.      Plaintiffs are unsuspecting victims of Defendants' knowing participation to, and negligent assistance of, a fraudulent investment scheme that involved the sale and exchange of various unregistered securities that purportedly provided investors with an opportunity to share in the growth of privately held start-up MDO, LLC (the "MDO Scheme").

2.      Pursuant to the MDO Scheme, Plaintiffs were led by the actions of the MDO Scheme's perpetrators, which included Defendant George Marcus and Michael Liberty, to believe that they were investing, indirectly, in fast-growing privately-owned MDO, and later on Mozido, Inc., which bought all of MDO's assets. MDO described itself as a technology start-up company offering mobile business solutions for its customers, including a "mobile wallet" which would allow customers to use their cell phones to pay for products and transfer money. In reality, Liberty and his associates raised more than $55 million of investor money, and misappropriated most of it to fund Liberty's lifestyle, including chartered flights, a dairy cow farm, and the funding of a movie production.

3.      Defendants are a Portland, Maine law firm, Marcus Clegg, and a partner of the firm, Marcus, whose practice is focused on corporate law and commercial litigation.

4.      Defendants' misconduct in this case occurred within their legal practice, including their drafting of faulty and misleading legal documents and their negligent and improper handling of investor funds deposited in their law firm IOLTA account, in breach of their duties and in other instances outside of their legal services wherein Defendant Marcus became directly

---

concerning the MDO and the entities and individuals mentioned in this complaint. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

involved in the improper sale of securities, misrepresentations and omissions of material facts to investors, and the misappropriation and misuse of the investors' funds.

5.　　In some instances, Defendants knowingly assisted the MDO Scheme, while in other instances they negligently participated in the victimization of investors, by, for instance negligently making misrepresentations to investors and negligently and improperly handling funds deposited by investors in Defendants' law firm IOLTA account.

6.　　According to the SEC Action, the MDO Scheme was conducted through a series of six unregistered securities offerings between 2010 and 2016. By 2010, MDO was in bad financial shape. It was losing money and it had lost its largest investor. It desperately needed a cash influx. A new investor, Mobile Technology Investments, LLC ("MTI") stepped-up and purchased 15.6% of the Company. The purchase price ($2.5 million) reflected a valuation of $13.5 million for the entire Company.

7.　　To memorialize this purchase, MDO and its owners amended MDO's operating agreement to reflect MTI's new ownership interest (the "Amended Operating Agreement" or "AOA"). The AOA gave MTI rights designed to prevent the dilution of its interest in MDO should additional capital be raised, through direct investment in MDO or indirectly through the sale of other securities. The AOA guaranteed that MTI would be notified before any additional shares/interests in MDO were issued, and MTI had a right of first refusal to purchase the additional shares/interests. MTI also received "piggy back rights" allowing it to participate in any sale of MDO securities to other investors. The AOA provided that any transactions involving the transfer of interests in MDO shares in violation of the AOA provisions designed to protect MTI's rights were void.

8.      In his role as an attorney for MDO, Marcus participated in the negotiations with MTI and negotiated the terms, including legal terms, of the amendments to MDO's Operating Agreement to recognize MTI's direct ownership interest in MDO. So Marcus knew that in early 2010, MDO was valued at $13.5 million. He also knew, in his capacity as MDO's attorney, that no additional securities could be sold that would serve to dilute MTI's interest in MDO, without informing MTI and without affording MTI the right to participate in any new offering of securities.

9.      MTI's investment in MDO was legitimate and was made with the full knowledge and approval of MDO's board.

10.      Liberty, along with his associate and co-conspirator Marcus and others, saw MDO's financial vulnerability as an opportunity to make money for themselves. With the privately held MDO serving as bait, Liberty with the help of Marcus and his associates went fishing for investors.  Only this time, the investors they sought would not be offered an opportunity to make legitimate investments directly in MDO. They were offered the opportunity to invest in investment programs controlled by Liberty, a "bad actor" who, unbeknownst to the investors, had a past history of securities fraud as evidenced by a prior case against him by the SEC.

11.      These investors were told by Liberty, with the assistance of Marcus, as co-conspirator, that they were being offered an opportunity to get in on the ground floor of MDO's growing business by indirectly investing in privately held MDO. They were told that their money was going to MDO to develop its technology and expand its markets; that the shell companies they were buying securities from owned interests in MDO or had the authority to sell them; that MDO's value was high and its financial situation was very strong; that Liberty had invested tens

of millions of dollars of his own money into MDO; and that Liberty was financially able to honor the personal guarantees he provided to investors along with the securities investors purchased.

12.     In fact, hardly any of the investors' funds was provided to MDO. Some of the shell companies did not own ownership units in MDO, and others held ownership units that they were prohibited from selling; MDO struggled financially, defaulted on its debt, and was at times valued at less than 10% of what Liberty, Marcus and their associates represented to investors. Liberty, at the time he was touting his large investment in the company, had really invested less than $5 million of his own money, as Marcus knew, and Liberty was in debt and had previously defaulted on personal guarantees to multiple investors. And, Marcus and Liberty never disclosed to investors Liberty's prior securities fraud case by the SEC, where Liberty consented to a judgment in a settlement agreement that prohibited him from denying the fraud allegations in the Commission's complaint.

13.     Marcus knew that investors were being provided with the materially false, misleading, and incomplete information described above, which he helped prepare.

14.     Marcus, and his law firm, Marcus Clegg, were right in the middle of the MDO Scheme, as Plaintiffs and the other investors sent their funds to Marcus Clegg, which were placed into law firm IOLTA accounts set up by Marcus Clegg for purposes of furthering the scheme described below.

15.     Marcus knowingly drafted legal agreements for these new investors that failed to disclose that the sale of securities to them was in violation of the AOA because FTI was neither informed of the sale nor given the opportunity to participate in it as a purchaser.

16. Marcus knowingly drafted legal agreements that attached fraudulent and negligent documentation showing that MDO was valued at many times the company's true worth, far above its 2010 valuation of $13.5 million.

17. Marcus knowingly drafted legal agreements that failed to disclose that his fellow co-conspirator, Liberty, had significant legal entanglements including a reprimand from the SEC, and Marcus failed to disclose to the new investors that their money would be used by Liberty to cover legal liabilities he had incurred in previous transactions.

18. Marcus and Marcus Clegg improperly allowed Liberty to use Marcus Clegg's IOLTA account as a conduit for investors' funds. They negligently and improperly handled investor funds deposited in their law firm IOLTA account and transferred that money to Liberty knowing that it was not going to MDO as it was supposed to, but rather was going to enrich Liberty and his co-conspirators. Defendants' negligence directly resulted in the misappropriation and misuse of the investors' funds.

19. By 2017, the scheme had unraveled and Plaintiffs investments were lost.

20. On March 30, 2018, the SEC filed a complaint[2] against Marcus, Liberty and others charging them with knowing participation in a scheme to bilk investors out of more than $55 million. The SEC alleged that Marcus assisted Liberty and knowingly participated in the underlying fraud.

## II.    JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over all Counts under the Class Action Fairness Act of 2005 and section 28 U.S.C. 1332, as revised, pursuant to which this Court has

---

[2] United States Securities and Exchange Commission v. Michael A. Liberty, *et al,* Case No. 2:18-cv-00139-DBH (March 30, 2018).

diversity jurisdiction because some members of the classes are citizens of States different than Defendants, and because the amount in controversy exceeds the sum or value of $5,000,000.

22.     Venue is proper in this District because many of the illegal acts giving rise to this case occurred in this District and Defendants are headquartered or reside in this District and do substantial business in the District.

## III.     PARTIES

23.     Plaintiffs are persons and putative class members who invested their personal money into the scheme during the Class Period and who were damaged thereby as a result of Defendants' conduct.

24.      Plaintiff Tina A. Endicott is a resident of Massachusetts who invested money in the MDO Scheme in or around February and August 2013. When she invested, Plaintiff Endicott transferred her investment proceeds to Defendants' law firm IOLTA account, held by Northeast Bank, account number xxxxxxx282.

25.     Plaintiff Denise T. Medina is a resident of Florida who invested money in the MDO Scheme in or around March 2013. When she invested, Plaintiff Medina transferred her investment proceeds to Defendants' law firm IOLTA account, held by Northeast Bank, account number xxxxxxx282.

26.     Defendant Marcus Clegg is law firm based in Portland, Maine.

27.     Defendant Marcus was, at all relevant times, a resident of Maine and a partner of Defendant Marcus Clegg.

28.     At all times, Defendant Marcus Clegg acted through its employees and agents including Defendant Marcus. In addition, Defendant Marcus Clegg had a duty to adequately

supervise Defendant Marcus. Lastly, Defendant Marcus Clegg is liable for Defendant Marcus' actions within the scope of his membership in the firm, by virtue of such membership.

## IV.    FACTS

### The Mozido Invesco Offering of Convertible Promissory Notes

29.    The first step in the MDO Scheme took place between, August 2010 and May 2012, when Liberty, Marcus, and their co-conspirators created an investment vehicle named the "Mozido Invesco Offering" which allowed investors to purchase convertible promissory notes that purportedly matured in 2015 and paid a guaranteed 5% return. The Notes were purportedly set-up so that they could be converted into direct holdings in MDO.

30.    Marcus participated and provided legal advice in the formation of Mozido Invesco Offering and drafted the promissory notes, and the note purchase agreements. In the course of his legal work for the MDO Scheme, he also drafted the personal guarantee issued to each investor in which Liberty guaranteed the investor that he or she would receive the interest payments as promised. Neither MDO's board nor MTI were informed about the creation or activation of the Mozido Investment Offering.

31.    The promissory notes and note purchase agreements, drafted by Marcus, were misleading. They misrepresented the financial position and prospects of MDO, claiming that MDO was valued at many times over what its true value was. They claimed that funds raised would be used to fund product development and new product launches, when in fact over 90% of the funds raised were used to line the pockets of the co-conspirators. The co-conspirators failed to disclose that the sale of the notes was in violation of the AOA, and they failed to disclose that Liberty's investment guarantee was of little value as Liberty's undisclosed legal and financial encumbrances made any guarantee payment by Liberty unlikely if not impossible.

32.     During the course of the Mozido Invesco Offering, Marcus made misstatements to investors and their representatives. He told one such representative that "it is clearly in [Liberty's] and everyone's interest to make sure that further equity raises… would not be dilutive on a value basis," and that there was a "commonality of interest with [Liberty] and every other investor".

33.     This statement was misleading and omitted material information, and Liberty and Marcus knew at the time. In fact, Liberty had used the Mozido Invesco investors' own money to dilute their interests, and he continued to promote Mozido Invesco, offer Mozido Invesco notes, raise money from existing and new investors, and update investors on their investment, without disclosing the dilution or that MDO's actual valuation was 10% of what they were paying.

34.     In addition, Marcus told another investor who asked for information about Liberty that previous charges brought against Liberty by the SEC were untrue, even though Marcus knew that under the terms of Liberty's settlement with the SEC, it was impermissible to deny the veracity of the SEC's allegations.

35.     Moreover, the Mozido Invesco Offering was conducted without filing the required forms with the SEC, which violated SEC rules and regulations, as Marcus, an attorney for the MDO Scheme, knew or was negligent in not knowing.

36.     While the Mozido Invesco Offering did not comply with this SEC filing requirement, Liberty and Marcus were concerned that they had obtained more investors in the Mozido Invesco Offering than was permitted by other SEC rules and regulations. To get around that, Marcus and his co-conspirators established LLCs composed of multiple investors to count as one investor, to circumvent that limitation. Through these machinations, Marcus and his co-conspirators were able to conceal that more than 100 investors who had participated in the

Mozido Invesco Offering, and falsely reported that there were only 92 investors participating in the Offering.

## The First Rescission Offer

37.     Between June 13, 2011 and July 13, 2011, Liberty and his associates conducted a second securities offering. Through it, some but not all of the initial investors in the Mozido Invesco Offering were given, ostensibly, the opportunity to get their money back ("The First Rescission Offer"). In reality, the purpose of this "offer" was to get the investors in the Mozido Invesco Offering, many of whom were unaccredited and unsophisticated investors, to ratify their initial investment, not to go through with the offer to rescind their purchase.

38.     The First Rescission Offer constituted a public offering of securities under the federal securities laws, but again, Marcus failed to file a registration statement with the SEC.

39.     The First Rescission Offer was accompanied by a campaign by Marcus' co-conspirators to convince investors to reject it. Investors were provided with misleading information about MDO's valuation, Mozido Invesco's use of the investors' investment money, and MDO's financial situation.

40.     After making the First Rescission Offer, Liberty and his co-conspirators continued to offer Modizo Invesco securities, and communicated with investors misrepresenting, among other things, the valuation of MDO, the "Mozido 'burn' rate" and liquidity to make it seem like MDO was performing better financially than it was.

41.     However, Marcus and his co-conspirators knew from information provided by MDO's CFO that MDO was expected to run out of cash by the last week of August 2011 and that its valuation as a company had declined to $13 million and was falling, far lower than the

$85-$100 million valuation that Marcus' co-conspirators related to the investors. Marcus and his co-conspirators falsely and negligently misrepresented to investors that they would be protected from dilution and fraudulently and negligently concealed that investors' money was being used to dilute their own interests, and that Liberty had only invested in MDO at levels below $15 million and that investors were buying at artificially inflated valuations.

## The Second Rescission Offer

42.     Between January 9, 2012 and February 2012, Marcus and his co-conspirators once again offered Mozido Invesco Offering investors the supposed opportunity to rescind their purchase of Mozido Invesco securities and recoup their investment ("The Second Rescission Offer"). Marcus, as attorney for the MDO Scheme, edited and finalized the Second Rescission Offer documentation.

43.     And like with the First Rescission Offer, Marcus and his co-conspirators falsely and negligently misrepresented material facts to investors to convince them not to tender their securities in the Second Rescission Offer. The documentation related to the Second Rescission Offer, edited, finalized and approved by Marcus, attached a misleading balance sheet. While Mozido Invesco's true balance sheet showed investor money being used for the benefit of the co-conspirators, including as "loans" of more than $14 million to, among others, Marcus Clegg's IOLTA account. In reality, those so-called "loans" were not memorialized, had no payment terms, and carried no interest. To hide the destination of the investors' money, the false balance sheet deleted these "loan" entries and fraudulently relabelled them as investment in Mozido Investments.

## The Exchange Offer

44.     In May and June, 2012, Marcus and his co-conspirators engineered a trade whereby Mozido Invesco Offering investors exchanged their Mozido Invesco Offering promissory notes (which came with a "guarantee") for non-voting units directly in MDO (the "Exchange Offer").

45.     In connection with the Exchange Offer, Marcus and his co-conspirators falsely represented to investors that MDO had a value which exceeded $108 million, thereby tricking investors into accepting securities that were worth, at best, a fraction of the face value of the Mozido Invesco promissory notes.

46.     In reality, MDO was worth much less and so the non-voting MDO securities they obtained through the Exchange were worth only a fraction of the face value of the Notes they exchanged.

47.     Marcus never informed the MDO board that the Exchange Offer, which was set up on a way to avoid requiring Board approval, violated the terms of the AOA he had drafted. Instead, to obtain the non-voting shares of MDO, on or about May 2012, Liberty and Marcus persuaded the MDO board to authorize the conversion of Family Mobile's interests in MDO (Family Mobile was a shell entity controlled by Liberty that owned a direct interest in MDO) into MDO non-voting Class B membership units.

48.     Mozido Invesco Offering note holders traded a total of $18.6 million in Mozido Invesco promissory notes for MDO shares that Liberty-controlled Family Mobile had acquired for approximately $1.9 million.

### The Brentwood and BRTMDO Offerings

49.     Still in need of additional financing, Marcus, Liberty and their co-conspirators engaged in the sale of additional promissory notes. These notes were issued by entities controlled

by Liberty, Brentwood Financial and BRTMDO. Between August 2012 and February 2014, investors were told that the purchase of notes issued by these two entities were indirect investments in MDO, convertible into security interests of MDO itself, and that funds from their investments would flow through to MDO to finance its growth.

50.     Like the Mozido Invesco Offering, however, the Brentwood Financial Offering and the BRTMDO offerings were a sham. Almost all of the proceeds from the sales flowed through to Liberty and his co-conspirators, not to MDO.

51.     Marcus, as attorney for the MDO Scheme, drafted the investment contracts and convertible promissory notes that were provided to investors in the Brentwood and BRTMDO Offerings.

52.     The BRTMDO Notes, drafted by Marcus, stated that they were convertible into MDO preferred membership units, even though, at the time, BRTMDO did not possess rights to those units, which Marcus knew but negligently omitted from the Offering documents. Marcus himself was involved in sending drafts of the Notes to potential investors.

53.     Marcus was also involved in the solicitation of investors in connection with the Brentwood Offering, directly and through his partnership and association with Liberty, providing them with financial statements that he knew were false and misleading. For example, he forwarded to investors a Brentwood Financial balance sheet showing that Brentwood Financial possessed investments or preferred membership units in MDO that it did not possess. The financial statements and other documents Marcus and his co-conspirators provided to investors concealed critical facts about the current true valuation of MDO, which they claimed exceeded $100 million, how proceeds raised through the Offerings would be utilized, the lack of authority

to sell, directly or indirectly, an interest in MDO preferred membership units, and Liberty's prior issues with the SEC.

54. The BRTMDO notes that Marcus drafted stated that "initial conversion price [to MDO preferred membership units] is based upon a valuation of MDO of One Hundred Million ($100,000,000) as of the date of this Note". Marcus knew that this valuation was greatly exaggerated. Marcus participated in a discussion in August 2012 with MDO board members, who had determined that MDO should be valued at $25 million.

55. On September 12, 2012, Marcus wrote to legal counsel for two investors to explain the proposed offer. Though he knew that MDO's board had recently placed a value of $25 million on the company, Marcus falsely wrote: "today's valuation of [MDO], which determines the pricing at issuance of the note… was set at $100,000,000."

56. On February 13, 2013, Marcus drafted an email for Liberty to send to a different investor, which said that the $3 million BRTMDO convertible promissory note carried a conversion price based on a "$100,000,000 valuation of [MDO] today." He also said that if converted, this would give the investor approximately 3% of MDO.

57. Investors in the Brentwood and BRTMDO Offerings were also instructed to send their funds to Marcus Clegg, where the funds were put into Marcus Clegg's IOLTA account. Once the funds were sent to the Marcus Clegg IOLTA, their funds were negligently and improperly commingled with other money Marcus Clegg received from its clients, in violation of ethical rules and regulations and in a departure from the applicable standard of care.

58. Marcus also approved the content of emails sent to investors on August 30, 2012, falsely claiming that Brentwood Financial owned MDO stock. It did not, and Marcus knew it.

Marcus also knew that neither Brentwood Financial nor BRTMDO were authorized to issue promissory notes that were convertible into MDO preferred convertible units.

59.     Marcus knew that Liberty was providing Brentwood Financial and BRTMDO investors with a personal guarantee that the investment would succeed, guarantees Marcus knew were worthless. Marcus also knew that Liberty had once before been sued by an MDO board member for failing to honor a personal guarantee on an MDO-related loan, but concealed that fact as well from investors. In 2013, Marcus went so far as to tell an investor that Liberty was a "victim" of the SEC, in violation of Liberty's prior settlement agreement with the SEC.

60.     Marcus also misled investors about the supposed "triple liquidation preference" of the MDO preferred units that investors expected to obtain. Marcus described this feature to investors and their counsel on many occasions, including in a September 10, 2012 email. Marcus said this feature provided investors with a pay-out of three times the investors' purchase price for Brentwood Offering promissory notes, plus a pro rata share of additional available funds, when under the terms of the relevant documents, instead of getting three times their initial investment, the preference payment would be below the purchase price of the Notes.

61.     In connection with these Offerings, Marcus also helped prepare false and misleading Form Ds which were filed with the SEC. On January 4, 2013, and again on November 22, 2013, Brentwood Financial and BRTMDO filed Form Ds and Amended Form Ds with the SEC. The Form Ds falsely declared that none of the proceeds of the Offerings would be diverted to Liberty or his co-conspirators, and that all purchasers and investor were accredited investors.  They were not.

**The Scheme Is Discovered but Not Stopped**

62.     After offering convertible notes for sale for months in violation of the AOA and the non-assignment provision of MDO notes, Marcus, Liberty, and their partners and co-conspirators sought to legitimize the sale of notes they had made. In December 2012 and January 2013, Marcus drafted an MDO board resolution that would, after the fact, grant BRTMDO permission to transfer interests in preferred membership units of MDO to third parties, the investors.

63.     The plan did not work, and the scheme concocted by Marcus and Liberty was exposed. In early 2013, MDO's Executive Chairman wrote to a fellow board member, copying Marcus on the letter, informing him of the scheme as he then knew it. The Executive Chairman made it clear that at the MDO board meetings, there had been "no mention of raising money at $100mm and arbitraging it into Michael's [Liberty's] own pocket on the way to [MDO]. I am quite certain that the current Board would absolutely reject this concept – I would … and I've certainly never seen anything like it in my business career."

64.     The Executive Chairman told Marcus this his failure to inform an MDO investor and fellow Board member of Liberty's default on a personal guarantee in the past was misleading. And on January 6, 2013, the Executive Chairman warned Marcus that he was very upset and that he viewed Liberty as being "totally out of control."

65.     Remarkably, Marcus defended his partner and co-conspirator, Liberty. He wrote the Executive Director and said, untruthfully, that Liberty had only raised funds from investors in his circle of friends, and that all of the investors were accredited investors. He also misleadingly wrote that investors were told that Liberty acquired MDO units when MDO was valued at $25 million and was selling them to the investors with a $100 million valuation for MDO. In reality,

most of the purchasers were strangers to Liberty, most of them were unaccredited investors, and they were not informed of the spread in valuations.

66.     In the end, the Marcus-drafted MDO board resolution to grant BRTMDO permission to transfer interests in preferred membership units of MDO to the investors was rejected. Nevertheless, Marcus and his co-conspirators continued to sell units to unsuspecting investors.

### MDO Sells Its Assets and Ceases Operations

67.     In late 2013, a large institutional investor agreed to invest in MDO's core business, but not its existing corporate form. So MDO sold its assets to a newly formed corporation, Mozido,

Inc., receiving common stock in exchange.

68.     MDO ceased operations and functioned only to hold Mozido stock and pay liabilities. The asset sale significantly weakened MDO's position in the Mozido enterprise. MDO sat below the institutional investor for liquidation purposes and retained considerable liabilities.

69.     Defendants did not tell investors that MDO restructured and was now a non-operating company saddled with debts and totally dependent on Mozido. Nor did Defendants tell investors that $15 million of investor proceeds from the institutional investor was used to settle a threatened lawsuit by insiders against Liberty for omissions and misrepresentations and breach of duty.

### The Brentwood Exchange Offer

70.     The Brentwood Exchange Offer was the sixth and final securities offering in Mozido scheme and was offered to Brentwood Financial and BRTMDO note holders.

71.     By fall of 2015, Liberty's scheme was unraveling. The three-year notes issued by Brentwood and BRTMDO had begun to come due. Mozido had no liquidity event and continued to lose money. Brentwood and BRTMDO did not have the $30 million to repay the notes, nor did Liberty have the cash.

72.     In 2016, Liberty, Marcus, and their co-conspirators conducted an exchange offer; Brentwood Financial and BRTMDO note holders could exchange their notes for preferred units of MDO.

73.     On April 27, 2016, Marcus and his co-conspirators caused Liberty's tax accountant to email solicitations to investors. The email notice provided no substantive information to investors about Brentwood Financial, BRTMDO, MDO or Mozido. Rather, Liberty, Marcus, and their co-conspirators actively concealed Mozido's dire financial situation, that on April 15, 2016, Mozido defaulted on $45 million in loans, that Mozido's only revenue generating subsidiary had been pledged as collateral and the creditor demanded a restructuring plan that resulted in MDO owning significantly less than 10% of Mozido.

74.     Liberty was trying to find new investors. On May 9, 2016, the manager of an investor group emailed Marcus that investors were asking questions about the valuation of the Preferred Units, so they could decide whether to convert. Marcus did not tell them of Mozido's defaults and precarious financial condition, and on May 10, 2016, Marcus perpetuated Defendant's prior lies about valuation when he misled investors about the 3X liquidation preference of the MDO membership units. In May 2016, Marcus omitted to tell investors that MDO had defaulted on a large loan and the creditor could seize and sell MDO's stock of Mozido to satisfy the debt. And he concealed that investors' holdings were significantly diluted and Mozido's preferred shareholders possessed a nearly $1 billion liquidation preference.

75.     In January 2017, Mozido effectively promised to sell its last remaining revenue generating business unit to repay creditors. But Liberty continued to mislead investors during a March 2017 conference call, omitting Mozido's dire situation and its sale.

### The MDO-Related Offerings Orchestrated by Marcus and Liberty Constituted a Single, Integrated Offering of Unregistered Securities, Conducted in Violation of the Securities Laws and Regulations

76.     The MDO-related investments offered and sold to investors by Liberty were securities under the Securities Act and the Exchange Act and the Maine Blue Sky Law.

77.     The MDO-related offerings orchestrated by Marcus and Liberty were publicly offered, through material misrepresentations and omissions, and in violation of the state and federal securities laws and regulations enacted therein, were never registered with the SEC or any other state securities authority and were not exempt from registration.

78.     Additionally, the MDO-related offerings orchestrated by Marcus and Liberty constituted a single, integrated securities offering.

79.     The MDO-related securities offerings overlapped and were conducted in parallel over a considerable period of time.

80.     All offerings offered the same type (class) of securities and were marketed with similar offering documents, through the same channels and methods, and to the same investors.

81.     All offerings were managed, overseen, and promoted by the same individuals.

82.     All offerings raised money for the same purported purpose, and the description of such purpose is nearly identical in all the programs' offering documents: to participate to the business and supposed profits and growth of MDO.

83.     Securities sold by Marcus and Liberty to investors were subject to the same material terms and conditions regardless of the program under which they were ostensibly sold.

84.     As more fully described herein, money invested in the MDO-related programs was commingled, misappropriated, used for the benefit of Marcus and Liberty, in the same way regardless of the program in which they were invested.

85.     Thus, the MDO-related programs orchestrated by Marcus and Liberty were part of a single plan of financing, were integrated, and comprised a single, unitary, and fraudulent securities offering that similarly victimized all investors in those programs.

**Lawyers' Obligations in Connection with Securities Offerings**

86.     Lawyers play a vital role in advising issuers, especially new issuers, in connection with securities offering.

87.     Lawyers typically assist issuers by, among other things, preparing disclosure documents including registration statements and private placement memorandums to be relied upon by potential investors in connection with the offering.

88.     Under the federal and state regulatory schemes, such disclosure documents are prepared for the benefit of the investors in such securities offerings.

89.     The complexities of the securities laws have resulted in extensive utilization of lawyers by issuers and others seeking to comply with these laws, for the protection of the investing public.

90.     The type and extent of work performed by the lawyer varies with the size of the transaction, any time limitations involved, and any fee restraints imposed.  The lawyer's relationship with the client will also vary depending on whether he or she has been newly-engaged by the client or has a long-standing relationship with the client, and whether he or she has been advising the client regularly or infrequently.

91.     Of course, a lawyer should not render a legal opinion or other legal advice, or draft legal documents for the benefit of unsuspecting third parties, based on factual information or material which he or she knows or suspects to be inaccurate in any material respect.

92.     A lawyer typically has no obligation to verify statements made or other information provided to him or her by the client unless he or she is of aware of inconsistent information or circumstances which reasonable alert him or her that such statements or information may be erroneous or incomplete in a material respect.

93.     When a lawyer is aware of such inconsistencies or circumstances, the doubts which they create should be resolved to the lawyer's satisfaction through further inquiry or other appropriate investigation.

94.     A lawyer's assistance in preparing offering documents for securities offerings often includes reviewing and analyzing issues concerning titles, important contracts, pending litigation,
and impact of laws having a special effect on the issuer.

95.     A lawyer should further assist the issuer in deciding what information should be included in the offering documents for a securities offering, how it should be included, and to what extent its omission would raise questions under the securities laws.

96.     The lawyer should advise the issuer when he or she believes that the offering documents for a new securities offering, as then proposed or filed, may be misleading.  In such circumstances, if the lawyer is not satisfied after pursuing the matter with the issuer, it may be appropriate for him or her to take other action such as informing the client's board of directors or resigning.

# V. CLASS ACTION ALLEGATIONS

97.     Pursuant to Fed. R. Civ P. 23, Plaintiffs bring this action on behalf of themselves and putative class members as defined below:

> All persons who purchased or acquired securities in the Mozido Invesco promissory note offering ("Mozido Invesco Offering"), the Family Mobile-Mozido Invesco Exchange Offer ("the Exchange Offer") or the promissory note offering made by Brentwood Financial or BRTMDO (the "Brentwood Offering") and/or its affiliates during the Class Period and who were damaged thereby.

Excluded from the proposed class are: (a) Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and (b) Defendant's legal representatives, predecessors, successors and assigns. The requirements for maintaining this action as a class action are satisfied as follows.

98.     Fed. R. Civ. P. 23(a)(1): Numerosity. The proposed class is so numerous and so geographically dispersed that the individual joinder of all absent class members is impracticable. While the exact number of absent class members is unknown to Plaintiffs at this time, it is ascertainable by appropriate discovery and Plaintiffs are informed and believe that the proposed class includes more than 100 members, thus satisfying the requirements of Rule 23(a)(1). Members of the proposed class may be identified from records maintained by Defendants, Liberty, and/or the entities they controlled and through which they raised money from investors, and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

99.     Fed. R. Civ. P. 23(a)(2): Common Questions of Law or Fact Predominate. Common questions of law or fact exist as to all members of the proposed class and predominate

over any questions which affect only individual members of the proposed class. These common questions of law or fact include, but are not limited to:

a. Whether Defendants' conduct violated the Maine Uniform Securities Act, Title 32, Chapter 135;

b. Whether Defendants were co-conspirators in connection with the investments in securities offered and sold in the MDO Scheme;

c. Whether Defendants owed Plaintiffs and the putative class members duties as attorneys, and the scope of any such duties;

d. Whether Defendants breached a fiduciary or other legal duty to Plaintiffs and the putative class members;

e. Whether the investments offered in the MDO Scheme were securities;

f. Whether the MDO Scheme securities were offered and sold in violation of the securities rules and regulations;

g. Whether the MDO Scheme perpetrators defrauded the MDO Scheme investors;

h. Whether Defendants committed legal and professional malpractice/negligence involving Plaintiffs and the putative class members;

i. Whether Plaintiffs and the putative class members suffered damages as a result of Defendants' conduct;

j. Whether Plaintiffs and the putative class members are entitled to damages, including punitive damages, and, if so, the amount of such damages;

k. Whether the MDO Scheme perpetrators defrauded the MDO investors;

l. Whether the MDO Scheme perpetrators owed fiduciary duties to the MDO investors;

m.  Whether the MDO Scheme perpetrators breached their fiduciary duties to the MDO investors;

n.  Whether Defendants had knowledge of the MDO Scheme perpetrators' fraud;

o.  Whether Defendants had knowledge of the MDO Scheme perpetrators' breach of fiduciary duty;

p.  Whether Defendants substantially assisted in the MDO Scheme perpetrators' fraud and breach of fiduciary duty;

100.  <u>Fed. R. Civ. P. 23(a)(3) and (4): Typicality and Adequacy</u>. Plaintiffs' claims are typical of the claims of the putative class members, and Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel with substantial experience in prosecuting securities-related cases, and class actions and in complex litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, and have the financial resources to do so. Neither Plaintiffs nor their counsel has any interests adverse to those of the class members.

101.  <u>Fed. R. Civ. P. 23(b)(1)(B)</u>: A class action is appropriate because the prosecuting of separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests (non-opt out class).

102.  <u>Fed. R. Civ. P. 23(b)(2)</u>: A class action is appropriate because Defendants have acted, and/or failed to act, on grounds generally applicable to the representative Plaintiffs and the class, thereby making appropriate final injunctive relief and or declaratory relief with respect to the class.

103. Further, a class action is an appropriate method for the fair and efficient adjudication of this controversy because there is no special interest in the class members in individually controlling the prosecution of separate actions. Absent a class action, most class members would likely find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. Absent class action, class members will continue to suffer harm and Defendants misconduct will proceed without remedy. The class treatment of common questions of law or fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

## VI.   COUNTS

### COUNT I: JOINT AND SEVERAL LIABILITY UNDER MAINE UNIFORM SECURITIES ACT, 32 M.R.S.A. § 16101, ET SEQ.

104. Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

105. Liberty violated 32 M.R.S.A. § 16301 by selling securities to Plaintiffs and the putative class that were neither registered nor exempt from registration.

106. Liberty violated 32 M.R.S.A. § 16501 by, in connection with the offer, sale or purchase of a security: (a) employing a device, scheme or artifice to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices or courses of business which operated or would operate as a fraud or deceit upon  another person. He did so by, among other things, selling securities to Plaintiffs and the putative class members without disclosing certain material facts discussed above, including that: the securities were not registered, investments in the MDO-related entities

violated the AOA and were void; the funds raised were not provided to MDO but to related shell companies in an attempt to circumvent the AOA; the funds raised were being diverted to Liberty and his co-conspirators; MDO's valuation was only a fraction of what was represented to the investors; MDO was struggling financially and that it had previously defaulted on certain debt obligations; Liberty had previously been sued by the SEC for fraud; and, Liberty's personal guarantees were worthless.

107.    Defendants were associated with Liberty, knew that Liberty was deceiving Plaintiffs and the other investors, materially aided Liberty's violations of 32 M.R.S.A. § 16301 and § 16501 and were therefore jointly and severally liable for his violations by virtue of 32 M.R.S.A. § 16509(7)(C).

108.    Each of Liberty's misrepresentations and omissions to Plaintiffs and the putative class members were material.

109.    Plaintiffs and the putative class members relied, or may be deemed to have relied, to their detriment on Liberty's false and misleading representations and omissions, and the aid provided to Liberty and his co-conspirators by Defendants.

110.    Plaintiffs and the putative class members were damaged as a direct and proximate result of Liberty's violations, and the aid provided to Liberty and his co-conspirators by Defendants.

## COUNT II: BREACH OF FIDUCIARY DUTY

111.    Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

112.    Defendants allowed Liberty to use their law firm IOLTA account as a conduit for investors' funds. The fact that the investors' funds were deposited in Defendants' law firm

IOLTA account gave Plaintiffs and the putative class members additional confidence that the transactions were above-board.

113.     Defendants owed Plaintiffs and the putative class members fiduciary duties in connection with their handling of the investor funds in their law firm IOLTA, or trust, account.

114.     Plaintiffs and the putative class members put trust and confidence in Defendants to exercise due care, loyalty, candor, and good faith in connection with the handling of investors' funds.

115.     As Defendants well knew, a great disparity existed between Plaintiffs and the putative class members, on the one hand, and Defendants (a lawyer and law firm), on the other hand, in connection with the handling of investors' funds once they were placed into Defendants' law firm IOLTA account.

116.     Defendants negligently and improperly handled the investors' funds deposited in their law firm IOLTA account. Rather than transfer the investors' funds to be invested in the MDO-related programs, as Defendants knew the Plaintiffs and the putative class members expected, Defendants transferred the funds to Liberty knowing that he would use them in order to enrich himself and his co-conspirators.

117.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and the putative class members were damaged.

### COUNT III: PROFESSIONAL LEGAL MALPRACTICE / NEGLIGENCE

118.     Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

119.     Defendants owed Plaintiffs and the putative class members a duty to conform their conduct to that of a reasonable attorney and law firm under the circumstances.

120.    Defendants breached their professional legal duties to Plaintiffs and the putative class members by, among other things, assisting in the sale of securities without disclosing certain material facts discussed above, including that: the securities were not registered, investments in the MDO-related entities violated the AOA and were void; the funds raised were being diverted to Liberty and his co-conspirators; MDO's valuation was less than 10 percent of what was represented to the investors; MDO was struggling financially and that it had previously defaulted on certain debt obligations; Liberty had previously been sued by the SEC for fraud; and, Liberty's personal guarantees were worthless.

121.    Defendants also negligently and improperly handled the investors' funds deposited in their law firm IOLTA account. Rather than transfer the investors' funds to the MDO-related entities, as Plaintiffs and the putative class members expected, Defendants transferred the funds to Liberty knowing that he would use them in order to enrich himself and his co-conspirators.

122.    Plaintiffs and the putative class members suffered damages as a direct and proximate result of Defendants' professional legal malpractice and negligence.

**COUNT IV: NEGLIGENT MISREPRESENTATION**

123.    Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

124.    Plaintiffs and the putative class members were supplied false and misleading information by the Defendants, including that: the securities were not registered, investments in the MDO-related entities violated the AOA and were void; the funds raised were not provided to MDO but to related shell companies in an attempt to circumvent the AOA; the funds raised were being diverted to Liberty and his co-conspirators; MDO's valuation was a fraction of what was

represented to the investors; MDO was struggling financially and that it had previously defaulted on certain debt obligations; Liberty had previously been sued by the SEC for fraud; and, Liberty's personal guarantees were worthless.

125.     The false and misleading information was material to Plaintiffs and the putative class members' decisions to invest in the securities. Plaintiffs and the putative class members would not have invested if they knew of the information's falsity.

126.     Defendants failed to exercise reasonable care or competence in communicating the information to Plaintiffs and the putative class members.

127.     Plaintiffs and the putative class members justifiably relied on Defendants' representations, and suffered damages as a result.

## COUNT V:  AIDING AND ABETTING FRAUD
### (*in the alternative*)

128.     Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

129.     Liberty knowingly made false representations and omissions of material fact, detailed above, to Plaintiffs and the putative class members in connection with the MDO Scheme. Those misrepresentations and omissions included: the securities at issue were not registered, investments in the MDO-related entities violated the AOA and were void; the funds raised were not provided to MDO but to related shell companies in an attempt to circumvent the AOA; the funds raised were being diverted to Liberty and his co-conspirators; MDO's valuation was a fraction of what was represented to the investors; MDO was struggling financially and that it had previously defaulted on certain debt obligations; Liberty had previously been sued by the SEC for fraud; and, Liberty's personal guarantees were worthless.

130.    Liberty made the false representations and omissions for the purpose of inducing Plaintiffs and the putative class members to invest in the MDO securities.

131.    Plaintiffs and the putative class members justifiably relied on Liberty's false representations and sustained damages as a result.

132.    Defendants acted in concert with Liberty in connection with the false representations made to Plaintiffs and the putative class members in connection with the MDO Scheme.

133.    Defendants had actual knowledge of Liberty's materially false representations and omissions made to Plaintiffs and the putative class in connection with the MDO scheme, because, among others, they had been involved in the preparation of documents that, as they well knew, included such misrepresentations and omissions, they were aware of Liberty's background by virtue of their professional relationship, they had been involved in the structuring of the offerings at issue, and they helped improperly divert investor money to Liberty through their law firm IOLTA account.

134.    Defendants substantially encouraged and assisted Liberty in connection with the false representations made to Plaintiffs and the putative class members in connection with the MDO Scheme. Such assistance and encouragement – and in particular, Defendants' decision to allow Liberty to use Defendants' law firm IOLTA account as his personal bank account, and their decision to actively participate in the securities sales process including by discussing about the investment with investors – was a departure from the typical services offered by lawyers to clients.

135.    As a result of Liberty's fraud, and Defendant's knowing encouragement and assistance thereof, Plaintiffs and the putative class members sustained damages.

## COUNT VI: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (*in the alternative*)

136.    Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

137.    Liberty owed Plaintiffs and the putative investors fiduciary duties of due care, loyalty, candor, and good faith.

138.    Liberty breached his fiduciary duties as discussed above.

139.    Defendants acted in concert with Liberty in connection with their breaches of their fiduciary duties to Plaintiffs and the putative class members.

140.    Defendants knew of Liberty's breach of fiduciary duties because they knew that Liberty was selling securities without prior notice to MTI and while misrepresenting to investors material facts about, among other things, MDO's financial position and prospects, that MDO was valued at multiples many times what they knew company valued itself, what the proceeds would be used for, and that Liberty diverted most of funds for personal use. In addition, Marcus knew that Liberty was selling securities while misrepresenting to investors critical facts about conversion feature, Liberty's role, and that Liberty's guarantee was of limited value as Liberty was struggling financially, and that Liberty's interests not aligned with investors.

141.    Defendants substantially encouraged and assisted Liberty's breach of his fiduciary duties to Plaintiffs and the putative class members. Such assistance and encouragement – and in particular, Defendants' decision to allow Liberty to use Defendants' law firm IOLTA account as his personal bank account, and their decision to actively participate in the securities sales process including by discussing about the investment with investors – was a departure from the typical services offered by lawyers to clients.

142.     As a result of Liberty's breach of his fiduciary duties, and Defendants' encouragement and assistance thereof, Plaintiffs and the putative class members sustained damages.

## COUNT VII: AIDING AND ABETTING CONVERSION
### (*in the alternative*)

143.     Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

144.     Liberty converted the funds Plaintiffs and the putative class members deposited in Defendants' law firm IOLTA account.

145.     Defendants acted in concert with Liberty in connection with his conversion of the investment funds.

146.     Defendants had actual knowledge of Liberty's conversion of Plaintiffs and the putative class' funds deposited in Defendants' law firm IOLTA account because the account at issue was theirs, and they managed, oversaw, and controlled the transactions in that account, and helped improperly divert investor money to Liberty through that account.

147.     Defendants substantially encouraged and assisted Liberty's conversion of the investment funds. Such assistance and encouragement – and in particular, Defendants' decision to allow Liberty to use Defendants' law firm IOLTA account as his personal bank account – was a departure from the typical services offered by lawyers to clients.

148.     As a result of Liberty's conversion of the investment funds, and Defendants' encouragement and assistance thereof, Plaintiffs and the putative class members sustained damages.

## COUNT VIII: CONSPIRACY
### (in the alternative)

149.     Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

150.     Liberty, on the one hand, and Defendants, on the other hand, conspired to defraud Plaintiffs and the putative class members.

151.     Liberty, on the one hand, and Defendants, on the other hand, conspired to breach their fiduciary duties to Plaintiffs and the putative class members with respect to the funds deposited in Defendants' law firm IOLTA account.

152.     Liberty, on the one hand, and Defendants, on the other hand, conspired to convert the funds Plaintiffs and the putative class members deposited in Defendants' law firm IOLTA account

153.     As a result, Defendants are jointly and severally liable with Liberty for Plaintiffs and the putative class members' damages.

## COUNT IX: RESPONDEAT SUPERIOR

### (AGAINST DEFENDANT MARCUS CLEGG)

154.     Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

155.     Defendant Marcus Clegg employed Defendant Marcus, who engaged in the above-described conduct in the course and scope of his employment.

156.     Defendant Marcus acted as Defendant Marcus Clegg's agent in connection with the above-described conduct.

157.     Defendant Marcus Clegg is liable for Defendant Marcus's actions under the doctrine of *respondeat superior*.

## COUNT X: NEGLIGENT SUPERVISION

## (AGAINST DEFENDANT MARCUS CLEGG)

158.     Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

159.     Defendant Marcus Clegg has the duty to supervise its employees including Defendant Marcus.

160.     Defendant Marcus Clegg breached its obligation to Plaintiffs and the putative class members to supervise the conduct of Defendant Marcus in connection with the MDO securities offerings.

161.     Plaintiffs and the putative class members sustained damage as a direct and proximate result of Defendant Marcus Clegg's failure to supervise Defendant Marcus.

### DISCOVERY RULE / TOLLING OF STATUTE OF LIMITATIONS

162.     Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

163.     Defendants' conduct was and is, by its nature, self-concealing. Through a series of affirmative acts or omissions, Defendants suppressed the dissemination of truthful information regarding the illegal conduct, and have actively foreclosed Plaintiffs and the putative class members from learning of their illegal, unfair and/or deceptive acts.

164.     By reason of the foregoing, the claims of Plaintiffs and the putative class members are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

**WHEREFORE**, Plaintiffs and the putative class members respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Determine that the action is a proper class action pursuant to Fed. R. Civ. P. 23; appoint Plaintiffs as class representatives; and appoint Plaintiffs' counsel as counsel for putative class members;

B. Awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial.

C. Awarding statutory attorneys' fees and costs, and other relief.

D. Granting such other and further relief as to this Court may seem just and proper.

## JURY DEMAND

Plaintiffs and putative class members request that all issues herein shall be tried to a jury.

August 22, 2018                             Respectfully submitted,

                                            */s/ Christiane D. Williams*
                                            Christiane D. Williams
                                            TERRY GARMEY & ASSOCIATES
                                            482 Congress Street, Ste 402
                                            Portland, ME 04101
                                            Telephone:      (207) 899-4644
                                            Facsimile:      (207) 541-9242
                                            Email:          cwilliams@garmeylaw.com

                                            Alan L. Rosca (pro hac vice forthcoming)
                                            Paul Scarlato (pro hac vice forthcoming
                                            GOLDMAN SCARLATO & PENNY PC
                                            Eight Tower Bridge, 161 Washington St
                                            Conshohocken, PA 19428
                                            Telephone:      (216) 242-6460
                                            Email:          rosca@lawgsp.com
                                                            scarlato@lawgsp.com

                                            J. Barton Goplerud (pro hac vice forthcoming
                                            Brian O. Marty (pro hac vice forthcoming)
                                            SHINDLER ANDERSON GOPLERUD &
                                            WEESE PC
                                            5015 Grand Ridge Dr, Ste 100
                                            West Des Moines, IA 50265
                                            Telephone:      (515) 223-4567
                                            Facsimile:      (515) 223-8887
                                            Email:          goplerud@sagwlaw.com
                                                            marty@sagwlaw.com

                                            *Interim Class Counsel for Plaintiffs*